STATE OF IOWA, appellee, v. W. L. HAESEMEYER, appellant.

No. 48851.

(Reported in 78 N.W.2d 36)

JULY 26, 1956.

REHEARING DENIED SEPTEMBER 24, 1956.

Donnelly, Lynch, Lynch & Dallas, of Cedar Rapids, John L. Mowry, of Marshalltown, and Carl Smedal, of Ames, for appellant.

Dayton Countryman, Attorney General, Raphael R. R. Dvorak and Kent Emery, Assistant Attorneys General, Charles King, County Attorney, and J. D. Robertson, Special Prosecutor, for appellee.

SMITH, J.—The indictment, returned October 8, 1954, and amended May 2, 1955, charged defendant, president of the Central State Bank of State Center, Iowa, with the statutory (Code section 528.84) offense of exhibiting with intent to deceive on May 29, 1952, to Edward B. Wilkinson, a State bank examiner, two false chattel notes of Martin Schaper, viz.: One dated October 10, 1951, for $45,000, purporting to be secured upon "300 Head Choice Steer Calves"; the other, dated February 1, 1952, for $15,180 upon "93 Head of Choice Hereford heifers." The bank was payee in each and each described the security as located upon Schaper's farm near State Center.

By way of amendment or bill of particulars the falsity was alleged to be that the described "security did not exist and the defendant knew it was false at the time it was so exhibited."

There was a plea of not guilty and a verdict and judgment from which defendant appeals. It is conceded that when the respective notes were signed and until the last week of April 1952 none of the security therein described was in Iowa, and that when exhibited to the examiner only part was at the designated location.

It also appears without question the notes, though signed by Schaper alone, were in fact obligations of a then unrevealed partnership ("Aurora Cattle Account") consisting of defendant and Schaper; and defendant contends it owned cattle at the respective dates of execution which in each case would fit the description of security in the note and were to be brought to Iowa.

The 300 cattle in the larger note (Exhibit B) are described as branded with a "bell" brand and as averaging "345#—together with feed and care to fatten for market, together with all increase and issue thereof and all additions thereto" and as given "to secure purchase price." Schaper testifies the description of security was not in the note when he signed and he never knew of its insertion until in June 1952. That point is in factual dispute.

Defendant claims that when Exhibit B was executed the partnership actually owned *305* head of that "bell" brand and description in the yards of a cattle company from which they had been purchased near Clovis, New Mexico, that they "were thereafter taken to Aurora, Nebraska, where they were kept until the last week in April 1952, at which time they were removed" to Iowa, and on May 29, when the bank was being examined, 68 were on Schaper's farm and the rest in other Iowa pastures rented by the partnership.

The claim as to the 93 head of Hereford heifers in Exhibit I is similar. It describes the cattle as "weighing 436 pounds average together with sufficient pasture, silage, hay, and corn to fatten for market." They were part of 203 head of that same description and among the 987 bought at Clovis. They were at

Aurora, Nebraska, on February 1, 1952, when Exhibit I was executed, and were also moved to Iowa the last week in April. It seems undisputed that on May 29, 1952, the partnership owned 300 head of "bell" brand and 93 head of Hereford heifers that fit the descriptions in the two notes.

The obvious illegality of the president becoming secret debtor of the bank for these and other amounts (see Code sections 528.6 and 528.7) was only incidental to proof of the State's alleged theory of "falsity." Nor is reliance placed by the State on the misdescription of location of the cattle except as a part of the proof of the nonexistence of real security.

The State contends these papers were false and unsecured when executed and were not originally intended to cover any particular animals; that the partnership never owned but two bunches, viz.: 308 head of Texas cattle branded "A B" purchased in Nebraska of Roe Black of Aurora (not involved in this case) ; and the 987 head bought from various ranches around Clovis, New Mexico, among them the 305 "bell" brand and the 203 Hereford heifers.

These 987 head were bought by Schaper while in New Mexico, probably the latter part of September 1951. The down payment of $15,000 was paid by check drawn by him down there and honored by the bank under arrangement with the defendant. The cattle were transferred by various shipments to Aurora, Nebraska, and eventually covered by separate notes and mortgages until refinanced by the $49,285 paper (Exhibit C) hereinafter referred to. The "305 head of Choice Steer Calves, weighing 365 pounds each, branded with the 'bell' brand * * *", according to Schaper's undisputed testimony were the only "bell" brand cattle the partnership ever owned and were covered by chattel note, Exhibit C, dated November 1, 1951, due in one year, payable to defendant's bank in the amount of $49,285.

This Exhibit C recites it was given "to secure the money advanced to purchase the within described cattle"; it also recites "free from encumbrance, and now in the undersigned's possession on F. E. Edgerton feed yards at Aurora, Nebraska (technical land description inserted) being the 'Roe Black Ranch.' " Schaper testifies it was returned to him "in its present form

* * * at the time the whole Aurora Cattle Account was refinanced in June 1952."

This instrument also shows it was acknowledged before a notary public in defendant's bank and endorsed "without recourse" to a Chicago bank. It was later returned to Schaper with his signature torn off and also a part of the filing stamp dated "November 5. C. E. Scov---." Schaper says it was so returned in June 1952. There is later testimony tending to show the torn name on the filing mark was "C. R. Scoville, County Clerk" in Nebraska, and that an identical copy was on file out there in that county.

Exhibit D, apparently covering the same cattle, is described as a "promissory note." It is for the same amount as Exhibit C ($49,285) and is stamp-dated October 19, 1951, crossed through with pencil and Nov. 5 written in and the name of payee blank. Schaper's signature is torn off. The form of the instrument is the same as that of Exhibit B. He says it was returned to him with Exhibit C.

Much time and argument were spent at the trial on the admissibility of Exhibits C and D and other somewhat similar instruments related to the cattle described in the $15,180 note also here involved.

The arguments made by attorneys for the State for their admission are difficult to summarize. They probably come to this: There was never any herd of *"300"* head of "bell" branded cattle, and none that was not otherwise mortgaged to cover their purchase price. The *305* head were so mortgaged for $49,285 by Exhibits C and D, the mortgage was transferred "without recourse" and eventually paid.

As said in oral argument in the trial court: It is not a case of two liens on the same lot of cattle because there never was any cattle there at the place described in Exhibit "B".

To all of which defendant's attorney in trial court argument responds: "In other words, that would go to show that Martin Schaper did in effect have 305 head of bell brand cattle out of which a mortgage lien could attach to 300 of them."

Without further quotation it remains to be said Exhibits C and D, and somewhat similar instruments relating to cattle de-

scribed in the other instrument (Exhibit I), were admitted upon the professional statement of attorneys for the State that they would connect with other evidence tending to show there was in fact no security in existence for the two notes.

This controversy and other errors assigned in argument will be disposed of as we proceed without following the order adopted in the exhaustive briefs and arguments. Defendant assigns and argues eighteen alleged errors in ten divisions of his brief, involving nine "brief points" and a total of 233 printed pages.

While we have tried to set out and perhaps clarify the contentions on each side as to the real "falsity" charged we are conscious that in face of a motion by defendant to direct verdict and similar motions we must look to the State's evidence alone to determine its sufficiency to sustain verdict.

I. Code section 528.84, so far as involved here, provides: "Any * * * officer * * * of any bank who shall knowingly * * * exhibit false papers with intent to deceive any person authorized to examine its condition * * * shall be punished * * *." The penalty runs as high as a fine of $10,000, and permits imprisonment in the penitentiary and complete disqualification for ever holding any office created by the chapter which is denominated "General Provisions relating to Banks and Trust Companies."

We have held that an indictment under it which charges the making of a false statement (instead of exhibiting a false paper) must describe the alleged false statement and the person to whom made with such particularity as to individuate the offense charged and enable the defendant to know what is intended to be charged. State v. Henderson, 135 Iowa 499, 113 N.W. 328.

In that case we said that "aside from the ordinary rule which exacts a strict construction of criminal statutes, it is to be observed that the penalty imposed is extremely severe" and in effect that the State must be held to a strict construction for that additional reason. (135 Iowa 504.)

The admonition is useful here because of the complicated situation necessarily shown to demonstrate the *falsity* of the papers involved; and also because of possible prejudice due to their practically conceded falsity in a particular not alleged. It is a criminal case and the procedural rules are not as elastic as in civil cases.

We can only uphold the verdict and judgment if there be substantial evidence to show the papers, exhibited to State Bank Examiner Wilkinson, were false in that the described security did not exist *as such security* when so exhibited. That is the "falsity" charged in the indictment, and the time stated in the statute. In the determination here there is involved also the possibility of a change in situation as to the existence of security between the dates of execution and the time the notes were shown to the examiner.

II.   Much time has been spent in argument as to the meaning of the word "exist" in the amended indictment. We think the keyword there is "security." The physical "cattle", under the evidence, existed both at times of *execution* and time of *exhibition* of the instruments. But were they available as security for these notes, Exhibits B and I?

We construe the indictment as charging nonexistence of the cattle *as security*—the security, not the *physical cattle,* was alleged not to exist. The trial court perhaps made the meaning of the charge as clear as possible by instructing: "The word 'exist' * * * would be an actual good faith existence *as it related directly to the security described* in said notes, as distinguished from a mere sham or make-believe security * * *." (Emphasis supplied.) Under that construction the State met its burden as of the dates of execution of the papers. It produced evidence of their original falsity in that regard sufficient to go to the jury.

But that situation may have changed and the State's burden was to produce evidence from which the jury could find it was the situation on May 29, the date the papers were shown to the bank examiner as assets of the bank.

III.   We are unable to find such evidence in the record sufficient to sustain the verdict. The State narrowed its charge of falsity within very narrow limits—possibly narrower than was necessary as now appears.

The value of the papers as assets at the time the bank was being examined is not the issue. Their actual collectibility is not the issue unless as affected by the falsity, alleged in the indictment, as of May 29, 1952. There is no substantial evidence to sustain a verdict that they were "false" then.

We are mindful of the weight of the burden we are placing on the State. But this is not a civil suit nor one between the bank and the maker of the notes or the bank and a third person, in an effort to collect. It is a criminal action upon a penal statute designed to help safeguard the efficiency of bank examinations for the protection of the public. It must be tried as such, strictly upon the charge of the indictment.

IV. We have vainly examined cited cases and sought authority on our own initiative for light on the question whether intervening time and events may render true something that was originally false, or bring to life security that did not originally exist.

The printed briefs have cited a wealth of cases on various other propositions. Defendant perhaps comes nearest in his contention that misdescription of the situs of physical security is not fatal to the right of recovery on an instrument. There is cited Aultman & Taylor Mach. Co. v. Kennedy, 114 Iowa 444, 87 N.W. 435, and other cases, to the proposition that a chattel mortgage describing the cattle as located in one place when they were really in another nevertheless created a valid lien between the bank payee and the maker. This would be true because the situs is only incidental to the security and may change.

And here the location of the cattle was only incidental as part of the proof the papers were in fact unsecured when executed notwithstanding they named existing cattle (existing but not available) as security. Logically their condition in that respect could change. The State's burden was to show falsity of the papers on May 29, 1952. Reluctantly we conclude it has not met that burden.

V. Other alleged errors are argued at length but we need not discuss them in view of our conclusion already stated. The case was carefully and ably tried by the court under the difficulties inherent in the facts and those incident to the presence of able and aggressive counsel on each side.

We have probably said enough to avoid any suspicion of judicial sympathy with, or approval of the conduct of, defendant in the transactions involved. The ancient truth "No man can

serve two masters" still prevails and defendant has not proved himself any exception to the rule.

The decision is reversed.—Reversed.

THOMPSON, C. J., and BLISS, GARFIELD, HAYS, LARSON, OLIVER, WENNERSTRUM, and PETERSON, JJ., concur.